## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

| | |
|---|---|
| **VALANCIA GOODMAN and GREGORY MALOY,** | ) |
| **Individually and as Administrators of** | ) |
| **the ESTATE OF JAYLAN ANDRISE GOODMAN,** | ) |
| | ) |
| **Plaintiffs** | ) **CIVIL ACTION** |
| | ) **FILE NO.** |
| **v.** | ) |
| **SHERIFF / CHIEF DEPUTY LEVON ALLEN** | ) |
| **CHIEF DEPUTY / SHERIFF ROLAND BOEHRER** | ) |
| **JAIL ADMINISRATOR TERRANCE GIBSON** | ) **Jury Trial** |
| **Jail Security Operations Section Commander** | ) |
| **KEVIN THOMAS** | ) **Demanded** |
| **Jail Security Operations Section Commander** | ) |
| **MAURICE JOHNSON** | ) |
| **MAJOR RONNAE TOLBERT** | ) |
| **JAIL OFFICER SERGION WILLIAMS** | ) |
| **JAIL OFFICER RASHAWN JOHNSON** | ) |
| **JAIL OFFICER JAMES STEWART, Jr** | ) |
| **JAIL OFFICER T. STEWART** | ) |
| **JAIL OFFICER JELANI FOSTER** | ) |
| **SGT. SYDNEY CANNON** | ) |
| **SGT. DAVID EVANS** | ) |
| **JAIL OFFICER BENJAMIN WALKER, Jr** | ) |
| **JAIL OFFICER K. CREWS** | ) |
| **JAIL OFFICER ELIZABETH SMITH** | ) |
| **JAIL OFFICER ANTONIA FITZPATRICK** | ) |
| **JAIL OFFICER COREY SMART** | ) |
| **JAIL OFFICER MARCELLA WOODS** | ) |
| **JAIL OFFICER JENNIFER LEY** | ) |
| **JAIL OFFICER MONTEZ HAWKINS** | ) |
| **LT. C. GAINES** | ) |
| **SGT. R. TROTMAN** | ) |
| **JAIL OFFICER K. GREENWOOD** | ) |
| **JAIL OFFICER D. DOYLE** | ) |
| **JAIL OFFICER C. BROUSSARD** | |
| **JAIL OFFICER J. BROWN** | |

**JAIL OFFICER A. JOHNSON**
**JAIL OFFICER T. CAMPBELL**
**JAIL OFFICER DWIGHT GREEN**
**JAIL OFFICER GRAY**
**JAIL OFFICER A. PARKS**
**JAIL OFFICER A. HART**
**JAIL OFFICER A. WILLIAMS**
**JAIL OFFICER A. REDDING**
**JAIL OFFICER A. GOODING**
**JAIL OFFICER A. FRASER**
**JAIL OFFICER A. RHODES**
**JAIL OFFICER A. FULLERTON**
**JAIL OFFICER A. KEMP**
**JAIL OFFICER B. GRISSETT**
**JAIL OFFICER B. OLIVER**
**JAIL OFFICER C. HODGES**
**JAIL OFFICER C. WILSON**
**JAIL OFFICER C. JOHNSON**
**JAIL OFFICER C. HARRELL**
**JAIL OFFICER C. MOORE**
**JAIL OFFICER C. NICHOLS**
**JAIL OFFICER C. THOMAS**
**JAIL OFFICER C. WILLIAMS**
**JAIL OFFICER C. BARNESKI**
**JAIL OFFICER C. A. DOZIER AVERY**
**JAIL OFFICER C. BARBARY**
**JAIL OFFICER C. BROUSSARD**
**JAIL OFFICER C. MCBRIDE**
**JAIL OFFICER D. SERENE**
**JAIL OFFICER D. JONES**
**JAIL OFFICER D. BURKS**
**JAIL OFFICER D. HARRIS**
**JAIL OFFICER D. LOTT**
**JAIL OFFICER D. CONNERS**
**JAIL OFFICER D. WILLIAMS**
**JAIL OFFICER D. AMBLES**
**JAIL OFFICER D. SMITH**
**JAIL OFFICER D. THOMAS**
**JAIL OFFICER D. GOMILLION**
**JAIL OFFICER D. MOORE**

JAIL OFFICER D. MCCAULEY
JAIL OFFICER D. WOODSON
JAIL OFFICER D. COBB
JAIL OFFICER E. JOHNSON
JAIL OFFICER F. GORDON
JAIL OFFICER F. ORJIAKO
JAIL OFFICER F. BROWN
JAIL OFFICER F. ZACHERY
JAIL OFFICER F. DENSON
JAIL OFFICER F. RADFORD
JAIL OFFICER G. AGORO
JAIL OFFICER G. MURPHY
JAIL OFFICER G. PERSON
JAIL OFFICER H. CLAIBORNE
JAIL OFFICER H. RICHARDSON
JAIL OFFICER J. MOSLEY
JAIL OFFICER J. STRICKLAND
JAIL OFFICER J. MERRITT
JAIL OFFICER J. TOOKES
JAIL OFFICER J. WILLIS
JAIL OFFICER J. SEALS
JAIL OFFICER J. HENRY
JAIL OFFICER J.A. SANCHEZ CALDERIN
JAIL OFFICER J. BROWN
JAIL OFFICER J. SCOTT
JAIL OFFICER K. CLAYBORN
JAIL OFFICER K. MCLAUGHLIN
JAIL OFFICER K. LEE
JAIL OFFICER K. WRIGHT
JAIL OFFICER K. WEAVER
JAIL OFFICER K. PATRICK
JAIL OFFICER K. BEAMAN
JAIL OFFICER K. MARTIN
JAIL OFFICER K. ROBERTS
JAIL OFFICER K. ROPER
JAIL OFFICER K. BROADNAX
JAIL OFFICER L. HUNTER
JAIL OFFICER L. LAYE
JAIL OFFICER L. FREEMAN
JAIL OFFICER L. PETION

JAIL OFFICER M. JAMES
JAIL OFFICER M. BUTLER
JAIL OFFICER M. MOORE
JAIL OFFICER N. FOSTER
JAIL OFFICER O. DALTON
JAIL OFFICER O. ODUROYE
JAIL OFFICER P.G.R. THOMAS
JAIL OFFICER P. FACCHINI
JAIL OFFICER P. DALMACY
JAIL OFFICER R. GADDY
JAIL OFFICER R. BROWN
JAIL OFFICER R. WALTON
JAIL OFFICER R. JONES
JAIL OFFICER R. AMEY
JAIL OFFICER R. JAMES
JAIL OFFICER R. PARKS
JAIL OFFICER R. BOYD
JAIL OFFICER R. BAXTER
JAIL OFFICER R. BAKER
JAIL OFFICER S. MACDONALD
JAIL OFFICER S. HOLLINSHEAD
JAIL OFFICER S. MOORE
JAIL OFFICER S.C. HOLMAN-FOSTER
JAIL OFFICER S.M. BANKS
JAIL OFFICER S.G. MORRIS
JAIL OFFICER S. FISHER
JAIL OFFICER S. WYCHE
JAIL OFFICER S. BLASSINGAME
JAIL OFFICER S. AJAKA
JAIL OFFICER S. TERRY
JAIL OFFICER S. HAYES
JAIL OFFICER S.E. WILLIAMS
JAIL OFFICER T. CLIFTON
JAIL OFFICER S. T. ALI
JAIL OFFICER I. N. DIXON
JAIL OFFICER J. CASTELLANOS
JAIL OFFICER T. SMITH
JAIL OFFICER T. BEADLES
JAIL OFFICER T. STOREY
JAIL OFFICER CHAMPION                    )

| | |
|---|---|
| **JAIL OFFICER GOSSIER** | ) |
| **JAIL OFFICER D.A. THOMAS** | ) |
| **JAIL OFFICER CRAIG WRIGHT** | ) |
| **JAIL OFFICER T. COLLINS** | ) |
| **JAIL OFFICER T. LEMONS** | ) |
| **JAIL OFFICER U. HOLLAND** | ) |
| **JAIL OFFICER V. WILLIAMS** | ) |
| **JAIL OFFICER W. MILLER** | ) |
| **JAIL OFFICER W. POOLE** | ) |
| **JAIL OFFICER W.J. JACKSON** | ) |
| **JAIL OFFICER W.D. THOMAS** | ) |
| **JAIL OFFICER R.S. WINN** | ) |
| **JAIL OFFICER L. LYONS** | ) |
| **JAIL OFFICER WATTS** | ) |
| **JAIL OFFICER X. STINSON** | ) |
| **JAIL OFFICER X. OCEAN** | ) |
| **JAIL CLASSIFICATION OFFICERS** | ) |
| **(working between July 9 and July 15, 2022)** | ) |
| **BOOKING OFFICER (working July 9, 2022)** | ) |
| **CORRECT HEALTH, LLC** | ) |
| **CORRECT HEALTH CLAYTON, LLC** | ) |
| **Dr. CHARLES CLOPTON, M.D.** | ) |
| **TIFFANIE MITCHELL,** | ) |
| **DEBORAH PILGRIM** | ) |
| **MAMIE MILLER,** | ) |
| **JOAN TAPPER,** | ) |
| **TERESA NICHOLSON,** | ) |
| **JOHN SIMS,** | ) |
| **RAMONICA JORDAN,** | ) |
| **SHENA CARTER,** | ) |
| **and JOHN DOES 1-10** | ) |
| | ) |

## COMPLAINT FOR DAMAGES

1.

COME NOW Plaintiffs to seek accountability for Defendants' violations of

the Constitutional rights of JAYLAN ANDRISE GOODMAN, who was

inhumanely and horrifically tortured and brutally murdered inside Clayton County Jail on July 14, 2022. Defendants were deliberately indifferent to GOODMAN's safety while GOODMAN was held at Clayton County Jail.

2.

Defendants failed to keep GOODMAN safe and violated GOODMAN's rights guaranteed by the Eighth and/or Fourteenth Amendments to the Constitution of the United States, Title 42, Section 1983 of the United States Code, and/or the laws of the State of Georgia. Defendants also acted in concert with one another to violate Plaintiffs's right of access to the courts under the First and Fourteenth Amendments by refusing to provide documentation, obstruct investigation and hide reports, and taking actions to cover up their misconduct after the fact.

**JURISDICTION AND VENUE**

3.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as to Plaintiffs's claims that arise under the Eighth and/or Fourteenth Amendments to the Constitution and/or laws of the United States, to wit 42 U.S.C. § 1983, and pursuant to § 1343, to redress the deprivation, under color of state law, of JAYLAN ANDRISE GOODMAN's rights guaranteed by the Constitution of the United States pursuant to §§ 1983 and 1988.

4.

This Court also has supplemental jurisdiction over the state law claims, if any, which arise from the same facts and circumstances, pursuant to 28 U.S.C. § 1367.

5.

Venue is properly conferred upon this Court pursuant to 28 U.S.C. § 1391(b)(2) as this Court lies in the judicial district and division in which a substantial part of the events or omissions giving rise to the above-captioned action occurred, it is the most convenient to the parties and to the witnesses, and it is where one or more of the Defendants are deemed to reside.

6.

This action has been brought within 1 year of the incident and by this filing, all public entity presentment provisions have been met.[1]

---

[1] See *Nusz v. Paulding County, Georgia*, 361 Ga. App. 131, 863 SE 2d 384 (Ga. App. 2021) (Footnote [7] Although the notice required by OCGA § 36-11-1 often is referred to as "ante litem" notice, see, e.g., *Moats v. Mendez*, 349 Ga. App. 811, 814-817(2), 824 S.E.2d 808 (2019); *Davis v. Morrison*, 344 Ga. App. 527, 531-532(2), 810 S.E.2d 649 (2018), the statute on its face does not explicitly require notice separate from the complaint to be presented before a complaint is filed. See *Mendez v. Moats*, 310 Ga. 114, 116(1), n. 1, 852 S.E.2d 816 (2020) ("OCGA § 36-11-1's mandate is properly termed `presentment,' because a Plaintiffs may satisfy the statute either by providing pre-litigation (ante litem) notice of his claim or by filing and serving his complaint within the 12-month time limit.") (Nahmias, P. J., concurring in the denial of certiorari); *Burton v. DeKalb County*, 202 Ga. App. 676, 677, 415 S.E.2d 647 (1992) ("[OCGA § 36-11-1] is not truly an ante litem

## PARTIES

7.

Plaintiffs VALANCIA GOODMAN and GREGORY MALOY are citizens

of the State of Georgia and the natural parents of JAYLAN ANDRISE

GOODMAN, who was killed at Clayton County Jail on July 14, 2022.

8.

JAYLAN ANDRISE GOODMAN was not married and had no children;

GOODMAN's parents are GOODMAN's surviving heirs and are applying to be

administrators of GOODMAN's Estate and now bring this action to vindicate

GOODMAN's rights.  Plaintiffs brings a wrongful death claim and a claim in their

representative capacities on behalf of the Estate for pain and suffering and punitive

damages.

9.

At all times relevant hereto, LEVON ALLEN and or ROLAND BOEHRER

were the Sheriff of Clayton County, Georgia, and or Chief Deputy, and were and

are responsible for oversight of the entire Sheriff's Office, including the jail and its

operations.  LEVON ALLEN and ROLAND BOEHRER are being sued both their

individual capacity and official capacity as law enforcement officers.  LEVON

---

notice statute because if a complaint is filed and properly served within the 12-
month time limit, the requirements of the statute are met.").

ALLEN and ROLAND BOEHRER at all times relevant hereto were acting pursuant to their employment and under color of state law and are subject to the jurisdiction and venue of this Court.

10.

Defendants ALLEN and BOEHRER were grossly negligent in their supervision of the other Defendants and were deliberately indifferent to the rights of GOODMAN, and have exhibited a pattern, policy, and custom of violating the rights of the citizens of Georgia, including Plaintiffs, through acts of deliberate indifference, allowing physical assault such that the other Defendants' misconduct is affirmatively linked to Defendant ALLEN and BOEHRER's acts.

11.

Defendants ALLEN and BOEHRER failed to adequately train and supervise the other Defendants and their negligent training and supervision was causally related to the constitutional violations committed by them.

12.

Defendants Clopton, Mitchell, Pilgrim, Miller, Tapper, Nicholson, Sims, Jordan, and Carter are or were employees of Correct Health and/or Correct Health Clayton, LLC and are subject to the jurisdiction and venue of this Court.

13.

Correct Health and/or Correct Health Clayton, LLC are domestic LLCs transacting business in the State of Georgia and County of Clayton. Correct Health and/or Correct Health Clayton contract with Clayton County and/or the Clayton County Sheriff's Office to provide healthcare services to jail inmates and are therefore amenable to suit for claims made under section 1983.  Correct Health and/or Correct Health Clayton, LLC are subject to the jurisdiction and venue of this Court.

14.

All other Defendants were employed as Jail staff and/or supervisory staff with the CCSO at all times relevant hereto and were acting pursuant to their employment and under color of state law. [2] All are being sued in their individual and official capacities. All are subject to the jurisdiction and venue of this Court.

---

[2] Named Defendants were compiled from news reports, other cases filed in Federal Court, and from the following website: https://openpayrolls.com/county/clayton-county-ga/page-473

This style of "shotgun" pleading was necessitated by Clayton County Sheriff's Office's persistent refusal to provide documents requested pursuant to Georgia's Open Records Request Act and MARSY's Act.  Exhibit A contains Plaintiffs' multiple requests and the Sheriff's Office multiple unnecessary refusals to provide information legitimately requested.

Clayton County Sheriff's Office has engaged in a persistent refusal to be transparent about deaths in the jail.  See, for example:

15.

Defendants listed were all named on government records as correctional officers.  These Defendants failed to take reasonable steps to prevent the attack of GOODMAN.[3]

16.

Defendants JAIL CLASSIFICATION OFFICERS (working between July 9 and July 15, 2022) and BOOKING OFFICER (working July 9, 2022) were Clayton County Sheriff's deputies acting within the course and scope of their employment with the Clayton County Sheriff's Department at all times relevant to this Complaint.  Plaintiffs is informed, believes, and thereon alleges that these unknown and unnamed Defendants are also legally responsible and liable for the incidents, injuries and damages hereinafter set forth, and that each of these Defendants proximately caused the injuries and damages by reason of negligence,

---

https://s3.documentcloud.org/documents/23701919/ccmeo_-petition-for-mandamus-e-gz3qhayb-accepted.pdf   attached as Exhibit B.

[3] Plaintiffs name Defendants in the alternative. Clayton County Sheriffs are given broad allowance to hide documents from Open Records Act requests, see O.C.G.A. §§ 42-5-36(b), 42-5-36(c), so Plaintiffs do not have the death investigation file (other than what the Medical Examiner provided) or associated records from the Jail.  Multiple requests were made for employee rosters pursuant to an Open Records Act request, but Defendants refused.  Plaintiffs will attempt in discovery to identify the correct Defendants.

carelessness, deliberate indifference, intentional, willful, or wanton misconduct, creating and otherwise causing the incidents, conditions, and circumstances hereinafter set forth.

17.

Defendants John Does 1-10 were Clayton County Sheriff's deputies acting within the course and scope of their employment with the Clayton County Sheriff's Department at all times relevant to this Complaint. Plaintiffs is informed, believes, and thereon alleges that these unknown and unnamed Defendants are also legally responsible and liable for the incidents, injuries and damages hereinafter set forth, and that each of these Defendants proximately caused the injuries and damages by reason of negligence, carelessness, deliberately indifference, intentional, willful, or wanton misconduct, creating and otherwise causing the incidents, conditions, and circumstances hereinafter set forth.

18.

Defendant John Does will be substituted and brought into this lawsuit in their individual capacities and served with process once their true identities are revealed in litigation.

19.

All Defendants were entrusted with decision-making authority regarding inmate classification, inmate dormitory, building, cell and cellmate assignments,

housing transfers, creation and / or implementation of customs or policies,

subordinate training and discipline, and the safety and protection of inmates,

including GOODMAN and or were directly involved in the circumstances that

resulted in the pain, suffering, degradation, and or death of GOODMAN.

## FACTS

20.

Former Clayton County Sheriff Victor Hill was arrested in April 2021, soon

thereafter suspended from duties by Governor Kemp, and ultimately convicted of

depriving pretrial detainees of their rights under color of law in late 2022.

21.

Defendants ALLEN and BOEHRER were responsible for the Clayton

County Jail following Sheriff Victor Hill's removal.

22.

**On July 8, 2022**, Deandre Hart, a pre-trial detainee at Clayton County Jail

diagnosed with schizophrenia and exhibiting warning signs of severe mental illness

that was well-known to jail staff and local law enforcement, was jumped and

stabbed 17 times while sleeping in the Clayton County Jail.[4]

---

[4] https://claytoncrescent.org/2022/07/13/questions-around-alleged-stabbing-at-clayton-county-jail/ attached as Exhibit C.

23.

The July 8, 2022 incident report and the incident start and end dates are listed as July 8, 2022 at 00:00:00. The officer making the report is listed as Ronnae Tolbert, badge number 30180.  The date the report was printed is listed as July 22, 2022 at 5:02:19 p.m. The report was uploaded to the Clayton County Open Records portal was July 25, 2022 at 10:25:35 a.m.  While two inmates were referenced in the written narrative, three were listed as suspects in the report.  All three were charged with aggravated assault, according to the report.  Neither the corrections officers nor the victim were named in the report.

24.

The July 8, 2022 incident narrative reads, "On July 8, 2022 at approximately 0210 hrs. a Correctional Officer was conducting cell checks in Housing Unit 6 Section 1 when they discovered via the cell window an inmate who appeared to be wounded and surrounded by blood.  There were also two inmates who were standing near him with what appeared to be "shanks' in their hands. The two inmates had shanks wrapped/tied with cloth. Correctional Officers immediately detained the two suspect inmates by placing them in handcuffs and escorted them out of the cell. The victim was given medical treatment and placed in the Infirmary. C.I.D. was notified and the case was turned over to them for further. End. of Report…"

25.

On July 8, 2022 at 4:36 pm, Clayton County Sheriff Officer C. Johnson

wrote and posted on social media the following:

"A lot of people would be surprised if they knew just how many inmates and

their families are looking forward to the return of Sheriff Hill in October."

"The crime not only skyrocketed on the streets in his absence, but in the jail

as well with inmate on inmate assaults going up 208%."

"Inmates' families have also received extortion threats as reported by other

local jails. Anyone who has ever took a tour of the Clayton County jail under

Sheriff Hill (which was once referred to "The Hill-ton") would know that

contraband, shanks, and gang violence was virtually null and void under the strict

para-military structure he had in place."

"Whoever came up with the idea/lie purporting that suspending Sheriff Hill

would protect inmates might want to rethink their logic."

26.

Photos of a bloody wall, five bloody shivs made from filed-down metal and

gauze-wrapped handles, and two images of detainees gathered around a cell door

in a common area were all posted at 4:36 p.m. on July 8[5]:

---

[5] https://claytoncrescent.org/2022/07/15/gory-jail-photos-posted-same-day-of-inmate-stabbing/  attached as Exhibit D.



**Victor Hill**
July 8 at 4:36 PM · 🌐

A lot of people would be surprised if they knew just how many inmates and their families are looking forward to the return of Sheriff Hill in October. The crime not only skyrocketed on the streets in his absence, but in the jail as well with inmate on inmate assaults going up 208%. Inmates families have also received extortion threats as reported by other local jails. Anyone who has ever took a tour of the Clayton County jail under Sheriff Hill (which was once referred to "The Hill-ton") would know that contraband, shanks, and gang violence was virtually null and void under the strict para-military structure he had in place.

Whoever came up with the idea/lie purporting that suspending Sheriff Hill would protect inmates might want to rethink their logic.

Carl Johnson
Social Media Manager

211

79 Comments  40 Shares

*Screen capture of a Facebook post by Clayton County Sheriff Victor Hill's social media manager, Carl Johnson. The photos were posted at 4:36 p.m. on July 8, the same day an inmate living with severe mental illness was allegedly stabbed 17 times. The man was treated at the infirmary and released back into general population two days later, according to his mother and activists. It's not clear whether the photos in the post are part of the official investigation, or whether the investigation was closed at the time the images were posted online. As of press time, The Clayton Crescent was still waiting for CCSO to fulfill an Open Records Request for basic information about the incident and the detainee's inmate sheet—information that, under Georgia's Open Records Act, is subject to disclosure even if an investigation is open.*

27.

**On July 9, 2022**, GOODMAN called 911 himself to report that he was having a mental health crisis and as a result had gotten into an argument with family members.  There was a minor scuffle between GOODMAN and his younger brother resulting in no serious injuries.

28.

GOODMAN's family informed Clayton County Police Department Officers Ho and Ruppert the family were not pressing charges and informed police that GOODMAN required mental health treatment.

29.

GOODMAN's family also contacted the mobile crisis team, which responds to mental health crises, seeking help for GOODMAN.

30.

GOODMAN himself told paramedics he was experiencing a "mental health break", had a "mental disability" and that he was having a "mental episode".

31.

Officer Ho instructed GOODMAN to write a report regarding what had transpired leading him to call 911.  GOODMAN stated he was unable to write a report regarding what had transpired due to his mental health condition, but GOODMAN did write something as instructed by Officer Ho.

32.

Officer Ho and Officer Ruppert both appear confused as to what

GOODMAN had written; it appears GOODMAN wrote "Do Not Press Charges":



33.

Regardless of the above, GOODMAN was arrested for family disturbance.

34.

GOODMAN was transported by Officer Ho to Clayton County Jail located

at 9157 Tara Boulevard, Jonesboro, Georgia 30236, bringing GOODMAN's blue

and white 'My Prescription' card with him in the police car:



35.

GOODMAN, who was a pre-trial detainee, exhibited a tenuous mental status that was easily overwhelmed by everyday pressures, demands and frustrations resulting in impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking and/or hallucinations.

36.

GOODMAN had a well-documented history of mental illness, including diagnosis of Bipolar Disorder (previously known as manic depression, a mental health condition that causes extreme mood swings that include emotional highs (mania or hypomania) and lows (depression)).

37.

Upon learning his son GOODMAN had been arrested for a minor transgression involving a scuffle with GOODMAN's brother during a mental health crisis, GOODMAN's father Gregory Maloy called Clayton County 911 to inform Clayton County Sheriff's Office that GOODMAN had mental health disabilities and GOODMAN's medications were not working.  GOODMAN's father warned Clayton County Sheriff's Officers that his son might attempt suicide, might not be able to control himself, and might attack someone or himself be attacked.

38.

Clayton County Jail states on its threshold that "all activities in this facility
are subject to be audio and video recorded".



Plaintiffs has requested video and audio recordings of GOODMAN but this
request has been refused by Defendants.

39.

Upon arriving at Clayton County Jail, Defendants conducted an intake and receiving screening of GOODMAN.  Upon information and belief, this is a photo of GOODMAN's security screening, taken from Clayton County Police Officer Ho's Body Worn Camera:



40.

The Clayton County Jail employs a two-step classification process for new inmates. First, a healthcare provider either clears the inmate for placement in the general population or recommends another option, such as placing the inmate in the medical infirmary or the mental health infirmary. If the healthcare provider clears the inmate for placement in the general population, a corrections officer then determines whether the inmate should be placed in minimum-, medium-, or maximum-security housing.

41.

This Complaint refers to those processes respectively as the health screening and the security screening.

42.

The health screening is supposed to follow best practices issued by the National Commission on Correctional Healthcare. The screening consists of a face-to-face interview between a healthcare provider and an inmate. During the interview, the healthcare provider asks the inmate about his medical and mental health history, including his use of medications, hospitalizations, head trauma or seizures, suicidal attempts or ideations, violent behavior or victimization, and sexual offenses. The healthcare provider then conducts a physical assessment of the inmate, which includes assessing the inmate's vital signs, general appearance,

attitude, mood, and affect. In particular, the healthcare provider considers whether the inmate presents as evasive, defensive, guarded, angry, anxious, frustrated, hostile, euphoric, tearful, flat, or blunted.

43.

The healthcare provider also completes a "SAD PERSONS" suicide screening, which generates a score based on indicators like the inmate's sex, age, history of depression, social support, and prior suicide attempts. A score less than six is considered low-risk for suicide; a score greater than eight is considered high-risk. If the results of the inmate's health history and physical assessment are within normal limits, the healthcare provider clears the inmate for placement in the general population.

44.

If the health screening was performed solely as shown by Clayton County Police Officer Ho's Body Worn Camera, then the health screening was performed unreasonably, with deliberate indifference, recklessly, and grossly negligently.

45.

Upon information and belief GOODMAN made his medical and psychological needs known to Correct Health and its employees as named in this Complaint; having knowledge of same, all were deliberately indifferent to Plaintiffs's serious medical needs.

46.

Plaintiffs' father also contacted the Sheriff's Office and informed the same.

47.

The day after GOODMAN's arrest, GOODMAN's father Gregory brought GOODMAN's medication to the Clayton County Jail.  The front desk receptionist (a lady) stated that GOODMAN "may get his medicine or he may not".

48.

The security screening, in contrast to the health screening, does not take place in a face-to-face interview with the inmate. Rather, a corrections officer relies on records to collect objective data about the inmate, including whether the inmate is currently charged with a violent felony, and whether the inmate has any prior violent felony convictions or any history of behavioral problems at the Jail.

49.

The corrections officer then inputs that data into an Initial Classification Form, which is a standard form that is endorsed by the National Institute of Corrections.

50.

The Initial Classification Form operates as a decision tree based on yes or no answers to nine questions. For example, if an inmate is currently charged with a violent felony, the decision tree indicates that the inmate should be placed in

maximum-security housing. If an inmate is not currently charged with a violent

felony, has no prior violent felony convictions, and has no escape history, the

decision tree indicates that the inmate should be placed in medium-security

housing

51.

Upon information and belief, this is a photo of GOODMAN's security

screening, taken from Clayton County Police Officer Ho's Body Worn Camera:



52.

If the security screening was performed solely as shown by Clayton County Police Officer Ho's Body Worn Camera, then the security screening was performed unreasonably, with deliberate indifference, and recklessly, and grossly negligently.

53.

Inmates are supposed to be housed according to their security classification. Certain housing units are designated to house maximum-security inmates; others are designated to house medium-security inmates. Within those housing units, inmates are placed in particular cells based on available space.

54.

The Jail was designed to house two inmates per cell. It is standard practice—nationally and in the state of Georgia—to double-cell medium security inmates in the general population. Each cell is equipped with an emergency call button. There are no video cameras inside the cells.

55.

At this time, Defendants should have known and learned of GOODMAN's mental health condition and that GOODMAN's medications were not working.

56.

Defendants should have known and observed that GOODMAN exhibited a tenuous mental status that was easily overwhelmed by everyday pressures, demands and frustrations resulting in impulsive behavior, poor judgment, a deterioration of emotional controls, loosening of associations, delusional thinking and/or hallucinations.

57.

GOODMAN received cursory, insufficient medical attention and treatment from Correct Health and/or Correct Health Clayton by and through its employees as named in this Complaint and same was insufficient.

58.

Defendants should have, but did not refer GOODMAN for special housing or to an appropriate mental health care professional, crisis intervention, and or other appropriate mental health coordinator and or service.

59.

Instead, Defendants assigned GOODMAN to a cell with an individual who was convicted for violent felonies who was overtly hostile toward GOODMAN; GOODMAN meanwhile was a pre-trial detainee accused of a misdemeanor family disturbance during a mental health crisis involving his sibling for which no one was pressing charges.

60.

Defendants were aware that Jarvin Cornelius Wallace had a history of violence including aggravated assault with a deadly weapon, and that Wallace was a convicted felon.



61.

Defendants were aware and had knowledge of Jarvin Cornelius Wallace's threats of violence toward GOODMAN.

62.

Defendants were aware and had knowledge of Jarvin Cornelius Wallace had multiple disagreements and altercations with individuals at Clayton County Jail.

63.

Defendants were aware and had knowledge of Jarvin Cornelius Wallace's history of violence and threats against GOODMAN and should have designated Wallace maximum-security, yet instead Defendants were deliberately indifferent to GOODMAN's safety and deliberately ignored this serious threat to GOODMAN's safety.

64.

Defendants could have taken reasonable measures to protect GOODMAN, such as the obvious measure of moving GOODMAN or inmate Wallace to another cell, but did not and instead disregarded the serious risk to GOODMAN.

65.

GOODMAN himself informed Defendants of the likelihood of violence and GOODMAN's parents also contacted Defendants to inform them that GOODMAN was not safe.

66.

On July 14, 2022 GOODMAN was attacked, tortured, raped, and murdered inside the cell by Jarvin Cornelius Wallace.

67.

Inmate-on-inmate assaults are a major problem in jails.

68.

Mixing inmates who should not be "housed" together creates a great risk of inmate-on-inmate assault.

69.

The heart of a jail's protection of inmates from an inmate-on-inmate assault is the jail's placement guidelines for the housing of dangerous inmates.

70.

Placement guidelines are designed to provide greater safety for inmates.

71.

Placement guidelines are designed to limit inmate-on-inmate assaults.

72.

Placement guidelines are designed to ensure the isolation of dangerous inmates.

73.

Jarvin Cornelius Wallace was known to be a violent inmate and dangerous to other inmates.

74.

Defendants knew Jarvin Cornelius Wallace presented a clear and present danger to any cell mate and in particular to GOODMAN.

75.

Defendants were aware of the serious threat to GOODMAN's safety and did nothing to address that threat.

76.

Plaintiffs sues under Section 1983 and the Eighth Amendment to the U.S. Constitution for Defendants' indefensible failure to protect GOODMAN from this horrific attack and brutal murder.  Defendants were deliberately indifferent to GOODMAN's safety.

77.

According to a report from the Medical Examiner's Office, GOODMAN's body was moved by Defendants from the cell to the infirmary by approximately 6:45 am on July 14, 2022.

78.

According to a report by Investigator Honey of the Medical Examiner's Office, EMS responded at approximately 8:40 am and GOODMAN was in what CCMed 7 EMS described as the infirmary with 3 other males.

79.

CCMed 7 EMS were told by jail personnel that GOODMAN was found seated on the floor with his head hanging down over the toilet and GOODMAN had been throwing up.

80.

CCMed 7 EMS attempted resuscitation, to no avail.

81.

CCMed 7 EMS advised Investigator Honey, GOODMAN was hard to intubate due to GOODMAN's airway being obstructed by bright red blood and vomitous in the airway.

82.

GOODMAN was in asystole throughout the code and never regained a pulse.

83.

GOODMAN was maxed out on Advanced Cardiac Life Support (ACLS) drugs by the time CCMed 7 EMS arrived to the ER.

84.

GOODMAN was pronounced deceased seven minutes later.

85.

At 9:25 am on July 14, 2022 Southern Regional Medical Center informed the Medical Examiner's Office of GOODMAN's death.

86.

Investigator Honey from the Medical Examiner's Office arrived at Southern Regional Medical Center at 10:15 am.

87.

According to the Medical Examiner, multiple Defendants attempted to block Investigator Honey of the Medical Examiner's Office from examining GOODMAN's body and were "agitated" by the presence of the Investigator and told Investigator Honey "that they were not ready".

88.

Defendants initially informed the Medical Examiner's Office that GOODMAN's death was "natural".

89.

The Medical Examiner also reports that multiple Defendants had "gotten upset" with the registered nurse at the hospital for notifying the Medical Examiner of GOODMAN's death.

90.

The reporting Registered Nurse Noelle stated jail personnel had gotten upset with her because she told them she had notified Investigator Honey and Honey was on the way.  Jail personnel stated to RN Noelle they were not ready for Honey to come.  RN Noelle advised jail personnel they have their rules and the hospital has their rules.  RN Noelle was going by what her job and the hospital dictates.

91.

There was an Officer outside the door and would not allow entrance.

92.

Investigator Honey reports a phone conversation with Lt. Tolbert.  Lt. Tolbert advised a GBI Agent was on the way to the ER and one was already at the jail.  GBI Agent Morris from Region 10 arrived to the ER around 11:30 am and photographs of GOODMAN's body were taken and examination was conducted.

Jail Officer Craig Wright, #29115 is listed as reporting officer and Officer Dwight Green, #28635 is listed as the report approving officer.  See Exhibit A. [6]

---

[6] Defendants Tolbert, Wright, and Green's listing on government records is sufficient proof of an officer being "directly involved" in the incident.  See, e.g. *Johnson v. Jones*, 515 U.S. 304 (1995) (evidence that officers were present, nearby when Plaintiffs was beaten was sufficient to deny qualified immunity on sufficiency of evidence grounds).

93.

Agent Steele of the GBI's Region 10 was already at the jail and was

finishing up interviews.  GBI Agent Steele took measurements of the toilet and the

depth of water. While doing the exam investigators noticed GOODMAN's hair-

dreads were wet as well as the hair next to his head.  The jail staff stated

GOODMAN's face was not in the toilet, just leaning over in the toilet.  According

to investigators, the dreads are not very long so GOODMAN would have had to

have his head pretty far in the toilet for the dreads to be wet.

94.

The Medical Examiner's autopsy finds scalp hemorrhage on the lower left

parietal region measuring just over 3.5 cm in its greatest dimensions.  Subgaleal

hemorrhage is identified at the level of the vertex and posterior over an area

measuring 15.5 x 12.0 cm in greatest dimensions, with smaller 8 to 10 individual

intervening hemorrhages on the head, varying in size from 1 cm up to 4 cm.  There

were also hemorrhages within both of the temporalis (jaw) muscles, right greater

than left.  Retrosternal hemorrhages were also found, tracing from the neck

through to the torso, where there were multiple hematomas.  Autopsy also

confirmed rib fracture (both new and healing with acute fracture through the

healing bone), and injuries to the back, buttock, and injuries to the right arm and

calf.

95.

Postmortem blood and urinalysis revealed negative results for common drugs and alcohol, positive for Haloperidol.

96.

Investigator Honey's report states decedent had a blood sugar of 95 at the jail per EMS and 95 when he arrived to ER.

97.

The Medical Examiner's office asked GOODMAN's family what medications he was prescribed and the Medical Examiner's Reports state GOODMAN "is on the following meds: Lithium, Divalproex, Novolin R 100 units Resperidone, Benztropine (Cogentin)".

98.

Dr Geoffrey P. Smith who conducted the autopsy found evidence concerning for sexual assault, and procured a rape kit, ultimately concluding there was in fact a rape.

99.

The Medical Examiner concluded the immediate Cause of Death:

"Drowning and Blunt Force Head Trauma with multiple impact sites."

"How Injury Occurred: Assaulted by other and head immersed/submerged in toilet bowl water."  Manner of Death: Homicide."

100.

Soon after GOODMAN was murdered, on Thursday, July 21, another

inmate at Clayton County Jail, Demetrius Eugene Alexander, allegedly died in the

jail.  Alexander, 43, of Morrow, had been in the jail since July 20.[7]

101.

A jail supervisor may be liable under § 1983 when that supervisor personally

participates in a constitutional deprivation or when there is a causal connection

between the supervisor's acts and the constitutional deprivation.  See *Brown v.*

*Crawford*, 906 F.2d 667, 671 (11th Cir. 1990).

102.

 When considering the claims of pretrial detainees, liability can attach when

a "prison official's deliberate indifference to a known, substantial risk of serious

harm violates the [Fourteenth] Amendment."  *Keith v. DeKalb Cnty., Ga*., 749 F.3d

1034, 1047 (11th Cir. 2014).  A showing of deliberate indifference requires "(1)

subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by

conduct that is more than gross negligence.  The Supervisory Defendants

personally participated in the decision to house GOODMAN with Wallace.

[7] https://claytoncrescent.org/2022/07/25/update-ccso-releases-one-jailhouse-stabbing-record/  attached as Exhibit E.

103.

As shown above, there was not adequate segregation of nonviolent inmates from violent inmates, pretrial detainees from convicted criminals, or inmates with mental disorders from those without mental disorders.

104.

The Jail housed more prisoners than the cells could accommodate.

105.

The Jail was routinely understaffed.

106.

There were insufficient head counts of prisoners made to make sure they were all accounted for.

107.

Locks on cell doors were not functional, allowing inmates to roam freely at all hours of the day and night.

108.

Homemade weapons were readily available to inmates an there was no lock down of prisoners in their cells at any point during the day or night.

109.

Cells were not adequately visually inspected.

110.

No jailer was assigned to maintain prisoners' security on the second floor where most of the inmates were housed.

111.

The Jail was not operated in accordance with written policies.

112.

Inmates were not appropriately screened for mental health, medical conditions or conflicts with other prisoners before entering the Jail and being housed within it.

113.

Prisoners were not disciplined or segregated when they threatened jailers, threatened other inmates, or assaulted other inmates.

114.

Prisoners were not appropriately segregated based on their proclivity for violence.

115.

There was only one jailer on duty.

116.

The jailer's quarters were out of earshot and eyesight of the prisoners' cell.

117.

Fights occurred between inmates on a regular basis resulting in injuries requiring medical attention and hospitalization.

## COUNT ONE
## 42 USC § 1983 CLAIM FOR VIOLATING GOODMAN'S RIGHT TO BE FREE FROM CRUEL AND UNUSUAL PUNISHMENT

118.

Plaintiffs re-allege the foregoing as if fully set forth herein.

119.

The incorporated facts and allegations of allowing and enabling GOODMAN to be maliciously, sadistically, inhumanely and brutally attacked violate GOODMAN's clearly established rights under the Eighth and Fourteenth Amendments to the US Constitution.

120.

Defendants' conduct in allowing this attack evidenced a disdainful and shameless disregard for GOODMAN's constitutional right to be free from cruel and unusual punishment.

121.

Considering the number of murders and stabbings at Clayton County Jail as described in this Complaint, serious inmate-on-inmate violence was the norm or something close to it.  In other words, this was no occasional, isolated attack, the

extensive history of violent encounters evidence Defendants fostered an

environment of extreme violence and such violence was pervasive.

122.

Consequently, Plaintiffs are entitled to all permissible damages, including

punitive damage to deter future Eighth Amendment violations at this institution.

**COUNT TWO**
**42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE**
**AND FAILURE TO PROTECT**

123.

Plaintiffs re-allege the foregoing as if fully set forth herein.

124.

The Eighth Amendment to the United States Constitution and 42 USC

§1983 impose a duty on prison officials employed by Clayton County Sheriff's

Office to "protect prisoners from violence at the hands of other prisoners."[8]

125.

Each Defendant was acting within the scope of his or her employment as a

state actor under the color of law during all events described in this Complaint.

---

[8] *Farmer v. Brennan*, 511 U.S. 825, 833 (1994); see also, *LaMarca v. Turner*, 995
F.2d 1526, 1535 (11th Cir. 1993) holding that an "unjustified, constant and
unreasonable exposure to violence" violates the Eighth Amendment.

126.

All Defendants were subjectively aware of a substantial risk of serious harm to Plaintiffs and did nothing to address the threat or to protect Plaintiffs.

127.

It is clearly established that a prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Eighth or Fourteenth Amendment.[9]

128.

It is also clearly established that prison officials violate an inmate's constitutional rights when they take no measures to protect an inmate/victim from attack by another inmate when that other inmate has a violent history and has been in violent and threatening altercations with the inmate/victim.[10]

---

[9] See *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

[10] See, e.g. *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1321 (11th Cir. 2016) (finding viable failure to protect claim after inmate asked to be removed from the cell he shared with a dangerous cellmate*); Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101 (11th Cir. 2014) (finding viable failure to protect claim where Plaintiffs inmate was placed in a cell with another inmate who had a "violent past, was very disruptive, and needed greater management," who had "started a dangerous cell fire," who had "expressed no regret at having endangered [the Plaintiffs's] life or safety," and who may have been "targeting [the Plaintiffs] with his unsafe actions.")

129.

Officials are liable for abuse of inmates when "the official knows of and disregards an excessive risk to inmate health or safety."

130.

Defendants were aware that Inmate Wallace was a violent convicted felon and that Inmate Wallace was threatening GOODMAN with violence.

131.

Defendants knew of multiple indicators that Wallace singled GOODMAN out for hostility, hatred, retribution, and attack yet disregarded those risks.

132.

Defendants were aware of a serious risk that Inmate Wallace could harm GOODMAN and disregarded that risk and failed to take reasonable and available measures to protect GOODMAN, such as transfer to another cell.

133.

Defendants' failure to take reasonable action to protect GOODMAN from known risks of serious harm amounted to deliberate indifference in violation of the Eighth Amendment and proximately caused GOODMAN's injuries, suffering, and death.

## COUNT THREE
## 42 USC § 1983 CLAIM FOR FAILURE TO INTERVENE TO PREVENT CIVIL RIGHTS VIOLATIONS

134.

Plaintiffs re-allege the foregoing as if fully set forth herein.

135.

GOODMAN was in the custody of Defendants at the time of this violent attack.

136.

At all relevant times, Defendants were charged with the constitutional duties of protection and with the duty to not knowingly, with wanton disregard, cause an inmate's life, health and safety to be placed in danger by intentionally or deliberately ignoring the known dangers that their actions placed GOODMAN in.

137.

Each Defendant had sufficient time and opportunity to so intervene and prevent GOODMAN's injuries.

138.

Failure to do so resulted in injuries and damages alleged herein.

## COUNT FOUR
## 42 USC § 1983 CLAIM FOR DELIBERATE INDIFFERENCE
## TO SERIOUS MEDICAL NEEDS

### 139.

Plaintiffs re-allege the foregoing as if fully set forth herein.

### 140.

Standard Operating Procedures provide:

"When making housing and programming assignments, the medical, mental health, and facility staff shall consider on a case-by-case basis whether a placement would compromise the offender's health and safety and any management or security concerns".

### 141.

Defendants failed to appropriately carry out this Policy.

### 142.

Defendants were required pursuant to Policy to evaluate, refer, and or adequately treat GOODMAN.

### 143.

Defendants over-medicated, under-medicated, and or provided incorrect medications to GOODMAN.

144.

Defendants unreasonably and intentionally failed to communicate with the other Defendants about GOODMAN's mental health circumstances.

## COUNT FIVE
## STATE LAW NEGLIGENCE Against CORRECT HEALTH, CORRECT HEALTH CLAYTON, LLC, CLOPTON, MITCHELL, PILGRIM, MILLER, TAPPER, NICHOLSON, SIMS, CARTER, JORDAN, and SMITH

145.

Plaintiffs re-allege and reincorporates the foregoing paragraphs 1 through 19 as if fully set forth herein.

146.

At all times, these Defendants had a duty to Plaintiffs to exercise ordinary care with GOODMAN.

147.

By failing to exercise ordinary care in their dealings with GOODMAN, these Defendants breached their duty of care to Plaintiffs

148.

**The Correct Health Defendants** over-medicated, under-medicated, and or provided incorrect medications to GOODMAN.

149.

The **Correct Health Defendants** failed to inform the other Defendants about GOODMAN's mental health circumstances.

150.

As a direct and proximate result of Defendants' actions as described herein, GOODMAN suffered serious injury and damage for which Defendants are liable including, but not limited to: physical, mental, and emotional pain and suffering; humiliation; embarrassment; distress; and death.

**COUNT SIX**
**42 U.S.C. § 1983 (Monell Liability) CLAIM**
**CLAYTON COUNTY HAS A DE FACTO POLICY OF IMPROPERLY STAFFING AND MISMANAGING CLAYTON COUNTY JAIL**

151.

Plaintiffs re-allege the foregoing as if fully set forth herein.

152.

Clayton County Sheriff's Office has created a dangerous, degrading, and inhumane environment for incarcerated individuals by failing to address staffing and mismanagement problems that they have known about for years.

153.

Clayton County Jail is improperly staffed, and is dangerous and inhumane.

154.

The result of years of neglect and poor management, as well as the

overreliance on uniformed staff who lack effective leadership—has inevitably

caused untold suffering, violating the rights of GOODMAN.

155.

According to reports of individuals who worked at Clayton County Jail: in

February 2022, "Working here has definitely been an interesting experience there

is definitely toxic leadership here and favorites. With that being said the

opportunities for growth and advancement are very good because of the revolving

door of employees that come and go. And I almost 2 years that I've been here I've

seen this agency at its strongest and weakest which is where we're currently at

(weakest). back when we had stronger numbers we definitely had an impact on the

community and crime in Clayton County this sheriff's vision was clear and we

made it happen. Things have taken a drastic time since then".

156.

Another individual who worked at Clayton County Jail stated in January

2022:

"Not a great place to continue a career in law enforcement. Some of the

reasons everyone is resigning and leaving to police elsewhere….Some of the

higher ups in the command staff are very vindictive and the structure is not solid.

Please do your own research on Clay Co Sheriffs Dept...”

157.

Another individual who worked at Clayton County Jail stated in September

2022:

“The management there along with the sheriff is more about dealing with its

officers personally (how they feel about you) rather then your job performance.

This makes it hard to succeed and do your job to the best of your ability and in

good faith.”

158.

According to a news reports dated August 1, 2022[11]:

Another reliable source who asked not to be identified for reasons of

detainees’ personal safety told The Clayton Crescent that, over many years, they

have never seen conditions at the jail that are as dangerous. According to that

source, some detainees allegedly are removing parts of doors to make shanks, with

groups of detainees jumping lone detainees.

“There’s no security at the jail,” the source stated, adding that the jail has

been understaffed for some time.

---

[11] https://claytoncrescent.org/2022/08/01/fbi-allegedly-searches-hills-office-again-as-new-federal-case-filed/   attached as Exhibit F.

159.

Multiple sources have told The Clayton Crescent that gang members allegedly are extorting other detainees in the jail, as well as those detainees' family members on the outside.

160.

On September 20, 2022 CCSO asked the Clayton County Board of Commissioners for $2,1786,000 "to provide lock and hinge repair throughout the Clayton County Jail" and another $2 million for the jail's health services contractor, Correct Health.[12]

161.

On October 4, 2022 Clayton County Central Services, on behalf of CCSO, asked the Clayton County Board of Commissioners for $120,000 from the General Fund to replace hinges and locks in the jail. CCSO has a contract with Willo Products Company, Inc. of Decatur, AL; the request was to amend the contract (PSA 22-263). The request passed unanimously. Previously, CCSO had asked for $2,176,000. At the same meeting, 107 CCSO correctional officers—about one-third of CCSO staff—got pay raises totaling $206,781.[13]

---

[12] https://claytoncrescent.org/2023/01/26/stabbings-gang-extortion-in-clayton-county-jail/   attached as Exhibit G.

[13] https://claytoncrescent.org/2022/10/04/boc-to-vote-on-ccso-requests-library-demolition-ethics/   attached as Exhibit H.

162.

Months later a news report states:

"Over the past month, in video and phone calls with The Appeal, along with one handwritten letter, six detainees described dangerous and inhumane conditions at the jail: Dozens of men share a few working toilets. The showers are cold. Men say they receive a clean jumpsuit only about once a month, even as some battle a bedbug infestation. The jail is crowded and understaffed. Detainees are forced to sleep on the floor.[14]

163.

"COs are actually working 16 hours every day because they don't have enough to staff the jail," said [ ] a detainee at the jail. "They're literally sleepwalking."[15]

164.

Bedbugs feast on [detainees] at night, according to another detainee, but the guards won't give detainees new uniforms.  Detainees have underwear confiscated

---

[14] https://claytoncrescent.org/2023/03/13/jail-detainees-say-their-lives-at-stake/ attached as Exhibit I.

[15] Id.

when they arrived, and are force to receive hand-me-down underwear from other detainees.[16]

165.

The doors to their cells don't lock, according to another inmate, who has been in and out of the jail in the years 2022 to 2023.  Detainees fear being attacked in the middle of the night, and have seen it happen to others.  During the fall of 2022, a detainee was shanked for a T-shirt.[17]

166.

At least 27 Clayton jail detainees have died since 2009, according to records obtained by The Atlanta Journal-Constitution.[18]

167.

Dehumanization plays an important role in the lead-up to interpersonal violence.  It is the cause, catalyst, and consequence of violence.

168.

Correction officers and prison officials are improperly and inadequately trained, and they are also severely mismanaged.

---

[16] Id.

[17] Id.

[18] https://www.ajc.com/news/clayton-jail-detainee-dies-after-struggling-with-officers/XNDZRP2P7ZHFLM2FOAR6NNGVGI/  attached as Exhibit J.

136.

These leadership failures exist through the hiring process, training, supervision, and discipline of officers.

138.

Moreover, uniformed staff are under-supervised and are rarely held accountable for wrongdoing.

139.

Uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs at the Jail.

169.

The classification system—a method by which the facilities separate detainees with prior violent histories with one another or who are affiliated with rival gangs—is in disarray and or has all but disappeared.  Staff and guards are ignoring affiliations, placing persons who have been ordered separate into the same dorms or even the same cells, leading to violent outbursts and serious injuries to inmates and guards alike.

170.

The high rate of staff absenteeism is exacerbating these long-standing problems. In some spaces, there are no guards to be found, leaving inmates vulnerable to attacks, unable to call for help, and isolated.

171.

It appears some guards are not just providing inmates permission but are actively involved in providing weapons, and are instigating violence and further contributing to disorder.  Officers have ceased confiscating weapons altogether, despite multiple stabbings and deaths.  These are *examples* of improper staffing.

172.

Inadequacies in the provision of medical care are also directly attributed to the problem of improper staffing and absenteeism and mismanagement.

173.

Individual inmates are simply unable to access routine as well as emergency health services.

174.

GOODMAN was deprived medical and mental health treatment for serious medical and mental health needs.

175.

Clayton County Sheriff's Office's persistently fails to train employed officers on how to keep incarcerated individuals safe and ensure that inmates receive the care and services to which inmates are constitutionally entitled and said failures caused and or contributed to GOODMAN's injuries and death and Plaintiffs' damages.

## COUNT SEVEN
## SUPERVISORY LIABILITY (Canton Liability) CLAIM

176.

Plaintiffs re-allege the foregoing as if fully set forth herein.

177.

Defendants by and through their acts and omissions have failed to implement meaningful accountability measures and have failed to conduct thorough investigations into acts of violence.

178.

Supervisory liability under 42 USC § 1983 occurs when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation.

179.

The supervisor Defendants ratified the actions and omissions of the other Defendants by failing to take reasonable steps to immediately intervene to remedy the constitutionally infirm conditions that led to the inadequate treatment GOODMAN was subjected to, and failed to prevent the placement of GOODMAN in immediate jeopardy.

180.

The supervisor Defendants moreover were unwilling, incapable, and or refused to take action to supervise their underlings and direct Defendants to actively intervene, deter, reasonably respond to and protect inmates from violence at the hands of other prisoners.

181.

The supervisor Defendants fostered an unreasonable environment of violence, an environment which motivated and encouraged inmates to commit violence against each other, and which resulted in GOODMAN's injuries and murder.

182.

Those failures proximately caused the conditions that led to, caused, and or contributed to GOODMAN's injuries and death.

**COUNT EIGHT**
**WRONGFUL DEATH**

183.

Plaintiffs re-allege the foregoing as if fully set forth herein.

184.

GOODMAN died unmarried and without children.

185.

Plaintiffs are GOODMAN's parents and as such hold statutory rights under

O.C.G.A. § 51-4-2 to pursue a wrongful death action regarding GOODMAN's

death.

186.

Plaintiffs pursue a wrongful death claim here in that capacity

187.

In their capacity as GOODMAN's parents, Plaintiffs are entitled to recover

the full value of GOODMAN's life and extreme pain and suffering as a result of

Defendants' acts and omissions while GOODMAN was an inmate in the custody

of Defendants at Clayton County Jail.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages and request the Court:

a. Issue process and summons in accordance with the law;

b. Award Plaintiffs compensatory and general damages in

an amount of not less than the full value of GOODMAN's life as to be

determined by the jury against all Defendants, jointly and severally;

c. Award Plaintiffs punitive damages in an amount as to be determined by the

enlightened conscience of the jury against all Defendants, jointly and severally;

d. Award costs of this action, including attorneys' fees, to Plaintiffs, pursuant to 42

U.S.C. § 1988 and other applicable laws regarding such awards against

Defendants, jointly and severally;

e. Award pre- and post- judgment interest to Plaintiffs under federal statutes and

case law;

f. Award Plaintiffs such other and further relief as it deems equitable, just and

necessary; and

g. Grant Plaintiffs a trial by jury.


Respectfully submitted this 11th day of July, 2023


**ERIC J. HERTZ, PC**

*/s/ Eric J. Hertz*
Eric J. Hertz
Georgia Bar Number 349501
*hertz@hertz-law.com*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210
Atlanta, GA 30350
(404) 577-8111
Fax: (404) 577-8116
*Counsel for Plaintiffs*