IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VALENCIA GOODMAN and | ) | |
| GREGORY MALOY, individually | ) | |
| and as administrators of the ESTATE | ) | |
| OF JAYLAN ANDRISE | ) | |
| GOODMAN, | ) | |
| Plaintiffs | ) | CIVIL ACTION CASE NO.: |
| | ) | **1:23-CV-03057-JPB** |
| v. | ) | |
| DEPUTY PHILIP ASHU | ) | |
| OFFICER E. BURGESS | ) | |
| CORRECTHEALTH CLAYTON, LLC | ) | |
| CORRECTHEALTH, LLC | ) | |
| RN THORNTON; RN FLOWERS; | ) | |
| MARSHA DEJOURNETT | ) | |
| ALTHEA LOGAN | ) | |
| NP JACQUELINE PARRISH | ) | |
| JOHN DOES 1-10 | ) | |
| Defendants. | ) | |
| | ) | |

## **AMENDED COMPLAINT[1]**

Plaintiffs, as personal representatives and the natural parents of Jaylan

Andrise GOODMAN, state and allege as follows:

---

[1] Plaintiffs received a portion of the GBI investigatory file (investigative summary, but not the attachments with the actual interviews, statements, or sketches and diagrams) and the inmate file for Jaylan GOODMAN. This new information enables Plaintiffs to make more specific allegations. Undersigned counsel certifies attorneys for the named Defendants consent to the amendment of the Complaint pursuant to <u>Fed. R. Civ. P. 15</u>. A motion to add & drop previously named Defendants will be submitted separately pursuant to <u>Fed. R. Civ. P. 21</u>.

Plaintiffs seek accountability for Defendants' violations of the Constitutional rights of GOODMAN, who was inhumanely and horrifically tortured and brutally murdered inside Clayton County Jail on July 14, 2022. Defendants were deliberately indifferent to GOODMAN's safety while GOODMAN was held at Clayton County Jail.[2]

## FACTS LEADING TO THE MURDER OF JAYLAN GOODMAN

### 1.

On July 9, 2022, Jaylan GOODMAN experienced a mental health crisis at home, got into a brief scuffle with his little brother, and called 911 himself. No

---

[2] The Fourteenth Amendment protects pretrial detainees from a substantial risk of serious foreseeable harm at the hands of other inmates. See *Jerry Nelson, et al. v. Keyvon Sellers*, # 22-14205 (11th Cir., decided January 5, 2024).
A jailer's deliberate indifference to a known and substantial risk of serious harm to an inmate is a constitutional violation. See *Hale v. Tallapoosa County*, 50 F.3d 1579, 1582, n. 4; *Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007) (noting that the standards under the Fourteenth Amendment are identical to those under the Eighth for purposes of a failure to protect claim).
See also *Bowen v. Warden Baldwin State Prison*, 826 F.3d 1312, 1320 (11th Cir. 2016), for factual scenario similar to the present case. To successfully state a claim premised on a failure to prevent harm, a plaintiff must allege facts showing that: 1) a substantial risk of serious harm existed; 2) the defendants were deliberately indifferent to that risk, i.e., they subjectively knew of the risk and also disregarded it by failing to respond in an objectively reasonable manner; and 3) there was a causal connection between the defendants' conduct and the constitutional violation...A plaintiff is not required to establish that the defendant intended that another inmate would harm the plaintiff, just that the defendant knew of a substantial risk that the other inmate would cause the plaintiff harm. See *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1099, 1102 (11th Cir. 2014).

one sought to press criminal charges but GOODMAN was arrested, and sent to Clayton County Jail.

2.

GOODMAN had a history of Bipolar Disorder, Schizophrenia and ADHD and before being arrested was prescribed Depakote ER 1000 mg nightly, Lithium ER 450 mg nightly, and Metformin 500 mg daily.

3.

GOODMAN's mental health crisis worsened at Clayton County Jail. GOODMAN was housed in the mental health unit and kept placing things into the toilet and rubbing feces and urine on the walls of cell MH-7.

4.

On July 12, 2022 a mental health psychiatry note was entered by NP Jacqueline PARRISH regarding GOODMAN:

> NP witness the Patient talking to himself at the door, hitting the door, and vigorously shaking his head up and down multiple times while exercising and states he was place in the INF because he needs to be alone because he has violent tendency. He is delusional because he states he wants the females in his family to cut his hair and make a wig from it and he sees his parents in the window and hears voices of echols [sic].

5.

According to GBI investigators on July 13, 2022 RN THORNTON interacted with GOODMAN.  RN THORNTON said GOODMAN was "definitely mental health". RN THORNTON said GOODMAN was urinating on the walls of his cell and wiping the urine on windows. RN THORNTON stated GOODMAN was taking "mental health medication" and did willingly took his medication.

6.

According to GBI investigators RN THORNTON further reported, as a result of interacting with GOODMAN, on July 13 she did not observe any bruises or marks on GOODMAN.  RN THORNTON said she did not know GOODMAN to be violent or dangerous.

7.

According to GBI investigators GOODMAN was described by LPC THORTON as being, in her professional opinion "psychotic and delusional". GOODMAN had drenched himself in water to calm down.

8.

On July 13, 2022, GOODMAN was placed in MH-15, the same cell as Jarvin Cornelius WALLACE, by Defendant E. BURGESS.

9.

Cell MH-15 is located in the hallway referred to as the "Infirmary isolation hall".

10.

Jarvin WALLACE was known by Defendants to be a Crips gang member classified as a MAX (maximum security) inmate, with a history of violence including aggravated assault with a deadly weapon, and was a convicted felon. WALLACE was in jail since March 4, 2022.

11.

WALLACE's CCSO Jail disciplinary record showed on 03/07/2022, WALLACE received fourteen (14) days in Disciplinary Segregation for "failure to comply with officers' orders and unauthorized absence". On 03/25/2022, WALLACE received an additional twenty one (21) days in disciplinary segregation for "failure to follow officer orders and failure to follow facility rules and regulations".

12.

According to GBI investigators, RN FLOWERS stated she is assigned to the infirmary of the Clayton County Jail. She is assigned to the care of mentally

unstable and medically unstable patients in the jail. She has been assigned to CCJ since November of 2021.

13.

According to GBI investigators RN FLOWERS stated on Tuesday July 12, 2022, WALLACE was brought down for evaluation. RN FLOWERS said in whatever housing unit he came from he was disrobing up there. WALLACE had taken his uniform off and tied it around his head in a turban. RN FLOWERS does not recall his diagnosis, but remembers him talking to himself and walking around in the holding area.

14.

At some point before July 14, 2022, Jarvin WALLACE was interviewed by LPC/NP THORTON and Jarvin WALLACE was described by LPC/NP THORTON as being, in her professional opinion "psychotic".

15.

On July 14, 2022 at 6:00 am Deputy Philip ASHU began his shift. Deputy ASHU is a 15 year veteran Deputy Sheriff with the Clayton County Sheriff's office.

16.

Deputy ASHU's first task of the day was to conduct a head count.

On July 14, 2022 at 6:30 am while performing the head count, Deputy
ASHU saw GOODMAN and WALLACE in cell number MH-15, and both were
completely naked.

## A SUBSTANTIAL RISK OF SERIOUS HARM NOW EXISTED

18.

According to a later statement by NP ALDRIDGE to GBI investigators, all
of the mental health patients have uniforms, so for both GOODMAN and
WALLACE to be naked was "odd".

19.

Not only is it "odd" but it is also against Clayton County Jail Dress Code,
which requires all inmates to wear the Clayton County Jail uniform.

20.

Considering Jarvin WALLACE was naked, Deputy ASHU had opportunity
to see WALLACE's various gang tattoos, including a large handicap symbol
tattooed on WALLACE'S throat/thyroid area, which considering Deputy ASHU's
15 years of training and experience, knew this to be a symbol used for gang
affiliation by the Crips/Rolling 60's.

21.

In addition, Deputy ASHU had a chart identifying that WALLACE was a MAX inmate and that GOODMAN was neither MAX nor gang affiliated.

22.

Deputy ASHU also knew from the chart that GOODMAN was experiencing a mental breakdown resulting in him being "psychotic and delusional", that GOODMAN stated to NP Parrish he needed to be alone.

23.

Deputy ASHU also knew that WALLACE was "psychotic" and had a history of violence including aggravated assault and had been in disciplinary segregation for "failure to follow officer orders and failure to follow facility rules and regulations".

24.

Deputy ASHU also knew from his experience as a 15 year veteran with Clayton County Sheriff's Office that housing gang members with non-gang members substantially risked serious violence.

25.

Deputy ASHU also knew from his experience as a 15 year veteran with Clayton County Sheriff's Office that housing convicted felons with pretrial detainees substantially risked serious violence.

26.

Deputy ASHU also knew from his experience as a 15 year veteran with Clayton County Sheriff's Office that allowing naked inmates in close quarters to remain unclothed frequently leads to rape and or violence and or prohibited carnal deeds and or exploits.

27.

Directly across the cell from MH-15 (where GOODMAN and WALLACE were housed) was MH-21, in which inmate Darius Yarbrough was located. Yarbrough was by himself in this cell. Yarbrough was not a mental health inmate.

**DEPUTY ASHU WAS DELIBERATELY INDIFFERENT TO THE RISK, KNEW OF THE RISK, AND DISREGARDED THE RISK BY FAILING TO RESPOND IN AN OBJECTIVELY REASONABLE MANNER**

28.

Rather than removing one of the naked inmates in MH-15 and placing one of them into a single cell like Yarbrough, or clothing the inmates, or taking any action

whatsoever with regard to the naked inmates in MH-15, Deputy ASHU walked away and continued his head count.

29.

There are 27 mental health cells in Clayton County Jail. As stated, cell MH-15 is in the hallway is referred to as the "Infirmary isolation hall". However, clearly GOODMAN and WALLACE were not isolated from each other and Deputy ASHU saw that.

30.

At 7:00 am Deputy ASHU returned from his head count and again saw GOODMAN and WALLACE in cell number MH-15, and both were still completely naked.

31.

Again, for both GOODMAN and WALLACE to be naked was beyond "odd" (as NP ALDRIDGE described their state of undress to GBI investigators) and Deputy ASHU knew from his experience as a 15 year veteran with Clayton County Sheriff's Office that naked inmates in close quarters frequently leads to rape and or violence and or prohibited carnal deeds and or exploits.

## 32.

Both inmates should have been wearing uniforms and should have been separated due to WALLACE's status as a MAX inmate and GOODMAN's status as medium.

## 33.

GOODMAN was known to be experiencing mental health crisis and had been, as stated, handling bodily fluids and wastes, was "psychotic and delusional" and "needed to be alone".

## 34.

WALLACE was a convicted felon and gang member with a violent history and was described by a Nurse Practitioner as "psychotic".

## 35.

Rather than removing one of the naked inmates in MH-15 and placing one of them into a single cell like Yarbrough who was in MH-21, or utilizing MH-7 (where GOODMAN had been the previous day), or another available cell (two cells down from NH-15), or clothing them, or taking any action whatsoever with regard to the naked inmates in MH-15, Deputy ASHU walked away.

## CAUSAL CONNECTION BETWEEN DEPUTY ASHU'S
## DELIBERATE INDIFFERENCE AND CONSTITUTIONAL VIOLATION[3]

36.

Deputy ASHU knew of and had at least two opportunities to prevent

GOODMAN from attack, torture, rape, and murder inside cell MH-15 by Jarvin

Cornelius WALLACE but declined to take any action whatsoever.

37.

According to GBI investigators, witness inmate Darius YARBROUGH

stated he had been in jail custody for over a month. YARBROUGH stated he had

been in his cell directly across from GOODMAN and WALLACE's cell for three

weeks. YARBROUGH stated his cell number was MH-21 and GOODMAN and

WALLACE's cell was MH-15. YARBROUGH stated he had been moved to cell

---

[3] This causal element requires proof that the officer "(1) had the means substantially to improve the inmate's safety, (2) knew that the actions he undertook would be insufficient to provide the inmate with reasonable protection from violence, and (3) had other means available to him which he nevertheless disregarded." *Rodriguez v. Sec'y for Dep't of Corr.*, 508 F.3d 611, 617 n.12, 622 (11th Cir. 2007) (evidence of specific death threats from other prisoners sufficient to survive summary judgment); see also *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003)). "A prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate [that causes serious harm to that inmate] violates the Fourteenth Amendment." Id. at 1355-58 ("[A] plaintiff [claiming deliberate indifference] must show that the constitutional violation caused the injury…detainee plausibly alleged that cellmate posed substantial risk of serious harm to all others based on cellmate's "violent tendencies," "history of schizophrenia," and prior assault on "another inmate").

MH-21 because he had been "jumped". YARBROUGH stated he was placed in the cell for protection. YARBROUGH went on to say he was not being treated for any mental health issue. YARROUGH stated WALLACE and GOODMAN had both be brought to cell MH-15 on July 13, 2022.

38.

According to GBI investigators YARBROUGH stated he initially woke up for "trays", breakfast at the jail. YARBROUGH stated he then went back to sleep. YARBROUGH stated he then woke up to the sound of "pounding and banging" coming from cell MH-15 (GOODMAN and WALLACE's cell).

39.

Upon information and belief, Deputy ASHU heard this "pounding and banging" coming from cell MH-15 and ignored it.

40.

According to GBI investigators YARBROUGH stated he looked through his cell window and saw an inmate with short hair (JARVIN WALLACE) and an inmate with dreads (JAYLAN GOODMAN) "start a match". YARBROUGH explained WALLACE and GOODMAN had squared up to each other like they were going to fight. YARBROUGH stated he could see the inmates in their cell because there was a rectangular window on their cell door.

41.

YARBROUGH stated he saw WALLACE and GOODMAN start wrestling. YARBROUGH said he then saw WALLACE grab GOODMAN from behind and slam him (GOODMAN) to the ground. YARBROUGH stated it then appeared like WALLACE was on top of GOODMAN, punching him.

42.

YARBROUGH stated he then saw WALLACE drag GOODMAN to their right of the cell, from YARBROUGH's perspective, looking into the cell from the window, it appeared WALLACE dragged GOODMAN to the left. YARBROUGH stated there was a toilet in the area that WALLACE dragged GOODMAN.

43.

YARBROUGH stated he could not see either GOODMAN or WALLACE for at least thirty (30) minutes. YARBROUGH stated he then saw WALLACE again. YARBROUGH stated WALLACE was pointing in his (YARBROUGH's) direction and appeared to be yelling.

44.

YARBROUGH stated WALLACE then started pointing the direction he (WALLACE) had dragged GOODMAN. YARBROUGH stated he could not tell what WALLACE was trying to say.

45.

YARBROUGH also stated both WALLACE and GOODMAN were nude in their cell.

46.

YARBROUGH stated approximately twenty (20) minutes later a Deputy and nurses arrived to the cell and opened the door. YARBROUGH stated he could see the legs of GOODMAN's body from the doorway of cell MH-15.

47.

DEPUTY ASHU later stated to GBI agents, at approximately 8:20 AM, he (ASHU) was escorting mental health professionals to cell MH-15 for a mental health check to be conducted on WALLACE and GOODMAN. DEPUTY ASHU stated when he reached the cell, he looked through the window into the cell, and saw GOODMAN was lying on the ground with his head in the toilet bowl. DEPUTY ASHU stated he radioed for assistance and opened the cell door.

48.

DEPUTY ASHU stated he escorted WALLACE out of the cell so that medical assistance could be provided to GOODMAN.

49.

DEPUTY ASHU stated as he was escorting WALLACE out of the cell, he (ASHU) asked WALLACE what happened. DEPUTY ASHU stated that WALLACE said something to the effect of, "he (GOODMAN) wanted to drink water". DEPUTY ASHU stated WALLACE and GOODMAN were both still naked.

50.

DEPUTY ASHU escorted WALLACE to cell MH-13. DEPUTY ASHU stated he took the inmate that had been staying in cell MH-13 to another cell so that WALLACE was alone in the cell. DEPUTY ASHU stated he later took WALLACE to a day room where WALLACE was kept alone and under observation.

51.

Contrary to Deputy ASHU's statement that he placed WALLACE in a cell alone after the murder, surveillance footage reviewed by GBI agents reveals at 8:23 am Deputy ASHU removed the nude WALLACE from MH-15 and placed WALLACE in a cell two cell doors down in MH-13 with another inmate. When Deputy ASHU opened the other cell door for MH-13, an inmate in an orange jumpsuit exited the cell, and after Deputy ASHU placed WALLACE in MH-13 the

other inmate in the orange jumpsuit went back into MH-13 with WALLACE. In so doing, Deputy ASHU left the naked WALLACE, who had just committed murder unsupervised with another inmate for thirty minutes.

52.

Deputy ASHU's statement is also an admission that MH-13 was at the time of GOODMAN's murder also occupied by only one inmate, and therefore GOODMAN (and or WALLACE) could and should also have been sole occupants in a cell or at minimum, the maximum security inmate should not have been left unsupervised naked with another naked medium inmate.

53.

At the time then of either of and both of Deputy ASHU's opportunities to separate the naked inmates GOODMAN and WALLACE at 6:30 am and 7 am, Deputy ASHU had the option of moving either inmate to Yarbrough's cell which was MH-21, or moving either inmate to MH-13, both of which had only one occupant. In addition, Deputy ASHU could have moved the occupant of MH-13 to Yarbrough's cell and then both WALLACE and GOODMAN could have been housed separately.

54.

Upon information and belief cell MH-7, where GOODMAN was previously housed, was also available.

55.

According to GBI investigators at 8:54 AM, Deputy ASHU removed the other inmate from MH-13, the cell he (Deputy ASHU) had placed WALLACE in. DEPTUY ASHU placed the other inmate in a different cell.

56.

According to GBI investigators from 8:58 AM to 9:00 AM, Deputy ASHU and another Deputy entered the cell WALLACE was placed in. Deputy ASHU was holding an orange jumpsuit.

57.

At 9:00 AM, Deputy ASHU exited the cell with WALLACE and WALLACE is wearing an orange jumpsuit. Deputy ASHU and the other Deputy escorted WALLACE down the hall and out of view of the camera.

58.

From 9:30 AM to 9:31 AM, members of CCSO jail staff passed through the hallway.  Deputy ASHU moved an inmate from one cell to another. It appears the

inmate DEPUTY ASHU moved is the one that was in the cell with WALLACE while aid was being rendered to GOODMAN.

59.

Deputy ASHU was never disciplined for allowing GOODMAN and WALLACE to remain naked in the cell nor was Deputy ASHU disciplined for placing WALLACE in a cell while with another inmate after WALLACE committed murder, while still naked.

60.

GBI agents conducted an interview of CHHAY TONY, an inmate at the CCSO Jail. TONY stated he was following around the mental health team as they were conducting rounds. TONY stated he was carrying out trash from the cells. TONY stated as they approached cell MH-15, one of the mental health workers saw an inmate lying on the ground with their head in a toilet. TONY stated that DEPTUY ASHU opened the cell door to check on the inmate.

61.

TONY stated he could see into the cell when the cell door was open. TONY said he saw the inmate lying on the ground with his head in the toilet. TONY stated he did not know the inmates name but stated the inmate had dreads (JAYLAN GOODMAN).

62.

TONY said GOODMAN's neck was on the edge of the toilet and his head was hanging into the toilet bowl. TONY stated GOODMAN's knees and shins were touching the ground. TONY stated GOODMAN's arms were hanging by his sides.

63.

TONY stated there was another inmate (WALLACE) in the cell. TONY stated the other inmate was standing near the door on the right of the cell. TONY stated he heard WALLACE mumbling, but could not hear what he (WALLACE) said.

64.

TONY stated both inmates were naked.

65.

TONY stated he (TONY) was around Deputy ASHU when head count was conducted at 7:30 AM, and GOODMAN was alive at the time of the 7:30 AM head count.

66.

TONY stated he had interacted with GOODMAN the day prior. TONY explained GOODMAN had been causing another cell to flood with toilet water.

TONY explained GOODMAN kept placing things into the toilet and rubbing feces on the walls of cell MH-7. TONY stated that he thought GOODMAN was moved into cell MH-15 because TONY was tasked with cleaning cell MH-7. TONY stated GOODMAN and WALLACE had been together roughly a day. TONY stated they were both naked together and heard they had been wrestling.

67.

At the time of his death, GOODMAN was a pretrial detainee who was determined not competent to attend court or enter a plea.

68.

At the time of GOODMAN's death, the Clayton County Jail was an extremely violent jail in which attacks, fights, assaults, and batteries were frequent and often resulted in injury to other inmates AND Deputy ASHU knew about this and was supposed to be on guard to prevent violence.

69.

Detainees awaiting trial and or bail at the Clayton County Jail fear for their lives and safety due to the frequency of violent altercations between inmates AND Deputy ASHU knew about this and was supposed to be on guard to protect inmates' lives.

70.

After the deadly attack on GOODMAN, WALLACE was able to possess prohibited items and participate in a riot in a penal institution.

71.

Inmate-on-inmate assaults and rape are a major problem in jails AND Deputy ASHU knew this and was supposed to be on guard to protect inmates.

72.

Mixing inmates who should not be "housed" together creates a great risk of inmate-on-inmate assault and rape AND Deputy ASHU knew this and was supposed to be on guard to prevent violence. Defendant E. BURGESS also knew this and was supposed to be on guard to prevent violence.

73.

Allowing inmates, especially inmates in delusional and or psychotic states, to be naked in close quarters with each other creates a great risk of inmate-on-inmate assault and rape AND Deputy ASHU knew this and was supposed to be on guard to prevent inmate-on-inmate assault and rape.

74.

Jarvin Cornelius WALLACE was known to be a violent inmate and dangerous to other inmates AND Deputy ASHU knew this.

75.

Defendants knew Jarvin Cornelius WALLACE presented a clear and present danger to any cell mate and in particular to GOODMAN AND Deputy ASHU knew this yet declined to prevent harm to GOODMAN.

76.

Upon information and belief Defendant ASHU was that WALLACE had made threatening statements, comments, movements, and or gestures that seriously threatened GOODMAN's safety and did nothing to address those threats.[4]

77.

Deputy ASHU knew of the substantial risk of leaving WALLACE alone with GOODMAN, and was deliberately indifferent to that known risk, which caused GOODMAN to suffer attack, torture, rape, and murder.

---

[4] A specific threat is not necessary if there is enough other information to show a specific risk of serious harm. In *Bowen v. Warden*, for example, there was no specific threat before an inmate killed his cellmate, but the officers had plenty of information to suggest that the attacker posed a specific risk of serious harm to any potential cellmate. 826 F.3d 1312, 1321 (11th Cir. 2016). Specifically, officers knew that (1) the attacker was a convicted murderer, (2) the attacker was "a severe paranoid schizophrenic who suffered from auditory hallucinations and violent delusions involving his cellmates," (3) the prison designated the attacker as a "Level III mental health inmate" who could experience "delusional thinking and/or hallucinations," (4) the attacker had recently been placed alone in a lock-down cell for assaulting his previous cellmate, and (5) the prison's guidelines required that the attacker be housed alone under the circumstances. Id. at 1322

## POST INCIDENT FACTS & ATTEMPTS TO OBFUSCATE

### 78.

According to a report by Investigator Honey of the Medical Examiner's Office, EMS responded at approximately 8:40 am and GOODMAN was in what CCMed 7 EMS described as the infirmary with 3 other males.

### 79.

CCMed 7 EMS were told by jail personnel that GOODMAN was found seated on the floor with his head hanging down over the toilet and GOODMAN had been throwing up.

### 80.

CCMed 7 EMS attempted resuscitation, to no avail.

### 81.

CCMed 7 EMS advised Investigator Honey, GOODMAN was hard to intubate due to GOODMAN's airway being obstructed by bright red blood and vomitous in the airway.

### 82.

GOODMAN was in asystole throughout the code and never regained a pulse.

83.

GOODMAN was maxed out on Advanced Cardiac Life Support (ACLS) drugs by the time CCMed 7 EMS arrived to the ER.

84.

GOODMAN was pronounced deceased seven minutes later.

85.

At 9:25 am on July 14, 2022 Southern Regional Medical Center informed the Medical Examiner's Office of GOODMAN's death.

86.

Investigator Honey from the Medical Examiner's Office arrived at Southern Regional Medical Center at 10:15 am.

87.

According to the Medical Examiner, multiple Defendants attempted to block Investigator Honey of the Medical Examiner's Office from examining GOODMAN's body and were "agitated" by the presence of the Investigator and told Investigator Honey "that they were not ready".

88.

Defendants initially informed the Medical Examiner's Office that GOODMAN's death was "natural".

89.

The Medical Examiner also reports that multiple Defendants had "gotten upset" with the registered nurse at the hospital for notifying the Medical Examiner of GOODMAN's death.

90.

The reporting Registered Nurse Noelle stated jail personnel had gotten upset with her because she told them she had notified Investigator Honey and Honey was on the way. Jail personnel stated to RN Noelle they were not ready for Honey to come. RN Noelle advised jail personnel they have their rules and the hospital has their rules. RN Noelle was going by what her job and the hospital dictates.

91.

There was an Officer outside the door and would not allow entrance.

92.

Investigator Honey reports a phone conversation with Lt. Tolbert. Lt. Tolbert advised a GBI Agent was on the way to the ER and one was already at the jail. GBI Agent Morris from Region 10 arrived to the ER around 11:30 am and photographs of GOODMAN's body were taken and examination was conducted.

93.

Agent Steele of the GBI's Region 10 was already at the jail and was finishing up interviews. GBI Agent Steele took measurements of the toilet and the

depth of water. While doing the exam investigators noticed GOODMAN's hair-dreads were wet as well as the hair next to his head. The jail staff stated GOODMAN's face was not in the toilet, just leaning over in the toilet. According to investigators, the dreads are not very long so GOODMAN would have had to have his head pretty far in the toilet for the dreads to be wet.

94.

The Medical Examiner's autopsy finds scalp hemorrhage on the lower left parietal region measuring just over 3.5 cm in its greatest dimensions. Subgaleal hemorrhage is identified at the level of the vertex and posterior over an area measuring 15.5 x 12.0 cm in greatest dimensions, with smaller 8 to 10 individual intervening hemorrhages on the head, varying in size from 1 cm up to 4 cm. There were also hemorrhages within both of the temporalis (jaw) muscles, right greater than left. Retrosternal hemorrhages were also found, tracing from the neck through to the torso, where there were multiple hematomas. Autopsy also confirmed rib fracture (both new and healing with acute fracture through the healing bone), and injuries to the back, buttock, and injuries to the right arm and calf.

95.

Postmortem blood and urinalysis revealed negative results for common drugs and alcohol, positive for Haloperidol.

96.

Investigator Honey's report states decedent had a blood sugar of 95 at the jail per EMS and 95 when he arrived to ER.

97.

The Medical Examiner's office asked GOODMAN's family what medications he was prescribed and the Medical Examiner's Reports state GOODMAN "is on the following meds: Lithium, Divalproex, Novolin R 100 units Resperidone, Benztropine (Cogentin)".

98.

Dr Geoffrey P. Smith who conducted the autopsy found evidence concerning for sexual assault, and procured a rape kit, ultimately concluding there was in fact a rape.

99.

The Medical Examiner concluded the immediate Cause of Death:

"Drowning and Blunt Force Head Trauma with multiple impact sites."

"How Injury Occurred: Assaulted by other and head immersed/submerged in toilet bowl water."  Manner of Death: Homicide."

100.

Deputy ASHU knew of the substantial risk of leaving WALLACE alone with GOODMAN, and was deliberately indifferent to that known risk.

## JURISDICTION AND VENUE

### 101.

This Court has jurisdiction pursuant to 28 U.S.C. § 1331 as to Plaintiffs's claims that arise under the Fourteenth Amendment to the Constitution and/or laws of the United States, to wit 42 U.S.C. § 1983, and pursuant to § 1343, to redress the deprivation, under color of state law, of JAYLAN ANDRISE GOODMAN's rights guaranteed by the Constitution of the United States pursuant to §§ 1983 and 1988.

### 102.

This Court also has supplemental jurisdiction over the state law claims, if any, which arise from the same facts and circumstances, pursuant to 28 U.S.C. § 1367.

### 103.

Venue is properly conferred upon this Court pursuant to 28 U.S.C. § 1391(b)(2) as this Court lies in the judicial district and division in which a substantial part of the events or omissions giving rise to the above-captioned action occurred, it is the most convenient to the parties and to the witnesses, and it is where one or more of the Defendants are deemed to reside.

## PARTIES

### 104.

Plaintiffs VALANCIA GOODMAN and GREGORY MALOY are citizens of the State of Georgia and the natural parents of JAYLAN ANDRISE GOODMAN, who was killed at Clayton County Jail on July 14, 2022.

### 105.

JAYLAN ANDRISE GOODMAN was not married and had no children; GOODMAN's parents are GOODMAN's surviving heirs and are applying to be administrators of GOODMAN's Estate and now bring this action to vindicate GOODMAN's rights. Plaintiffs brings a wrongful death claim and a claim in their representative capacities on behalf of the Estate for pain and suffering and punitive damages.

### 106.

Defendants E. BURGESS AND DEPUTY ASHU are listed and named on government records related to this incident and are sued in their individual capacities. These Defendants failed to take reasonable steps to protect and prevent the attack of GOODMAN as stated herein.

### 107.

Defendants RN THORNTON, RN FLOWERS, MARSHA DEJOURNETT, and NP JACQUELINE PARRISH are or were employees of CorrectHealth, LLC

and/or CorrectHealth Clayton, LLC and were acting within the scope of their employment with CorrectHealth. LLC and/or CorrectHealth Clayton, LLC at all times relevant herein and are subject to the jurisdiction and venue of this Court.

108.

CorrectHealth. LLC and/or CorrectHealth Clayton, LLC are domestic LLCs transacting business in the State of Georgia and County of Clayton. CorrectHealth, LLC and/or CorrectHealth Clayton, LLC contract with Clayton County and/or the Clayton County Sheriff's Office to provide healthcare services to jail inmates and are therefore amenable to suit for claims made under section 1983. CorrectHealth, LLC and/or CorrectHealth Clayton, LLC are subject to the jurisdiction and venue of this Court.

109.

Defendants John Does 1-10 were Clayton County Sheriff's Deputies acting within the course and scope of their employment with the Clayton County Sheriff's Department at all times relevant to this Complaint. Plaintiffs is informed, believes, and thereon alleges that these unknown and unnamed Defendants are also legally responsible and liable for the incidents, injuries and damages hereinafter set forth, and that each of these Defendants proximately caused the injuries and damages by reason of negligence, carelessness, deliberately indifference, intentional, willful, or

wanton misconduct, creating and otherwise causing the incidents, conditions, and circumstances hereinafter set forth.

110.

Defendant John Does will be substituted and brought into this lawsuit in their individual capacities and served with process once their true identities are revealed in litigation.

**COUNT ONE**
**DEPUTY ASHU'S**
**DELIBERATE INDIFFERENCE/FAILURE TO PROTECT GOODMAN**

111.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

112.

Deputy ASHU was acting within the scope of his employment as a state actor under the color of law during all events described in this Complaint.

113.

Keeping inmates safe was one of Deputy ASHU's primary functions at Clayton County Jail.

114.

Deputy ASHU was responsible for maintaining the safety of the Clayton County Jail's inmates including GOODMAN through regular inspections.

115.

Deputy ASHU was responsible for keeping inmates safe through monitoring the housing of inmates.

116.

Deputy ASHU had the responsibility to know the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates.

117.

A copy of the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates was accessible to Deputy ASHU.

118.

Deputy ASHU knew the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates required that mental health inmates, especially those who had assaultive behavior, were to be housed alone.

119.

Deputy ASHU knew there were rules at Clayton County Jail requiring inmates to be clothed appropriately.

120.

One of the reasons for Deputy ASHU's daily inspections of the unit was to make sure that the inmates were housed properly.

121.

Deputy ASHU had the authority to remove immediately an inmate from a cell if the inmate was in a cell with an inmate who was to be housed alone.

122.

Deputy ASHU had the authority to remove immediately an inmate from a cell if the inmate was in a cell with an inmate who was inappropriately dressed.

123.

Deputy ASHU had access to uniforms and could have required GOODMAN and WALLACE to get dressed.

124.

Deputy ASHU knew that GOODMAN and WALLACE were both mental health inmates with history of assaultive behavior.

125.

Deputy ASHU knew that WALLACE was gang affiliated and GOODMAN was not.

126.

Deputy ASHU knew that WALLACE had been convicted of a crime and GOODMAN had not.

127.

Deputy ASHU knew that WALLACE was a MAX maximum security inmate with a history of disciplinary problems while in jail and GOODMAN was not.

128.

Deputy ASHU knew that WALLACE and GOODMAN were both naked in the same small cell.

129.

Deputy ASHU had at least two (2) opportunities BEFORE WALLACE beat, raped, and murdered GOODMAN to remove either GOODMAN or WALLACE and house them alone.

130.

Deputy ASHU had at least two (2) opportunities BEFORE WALLACE beat, raped, and murdered GOODMAN to require GOODMAN and WALLACE to be dressed appropriately.

131.

Upon information and belief Deputy ASHU heard the sound of "pounding and banging" coming from cell MH-15 (GOODMAN and WALLACE's cell).

132.

Deputy ASHU, from his two (2) inspection of the cell knew that GOODMAN and WALLACE were being housed together from seeing them in the cell during his inspection, from the population chart, and from the inmate sheets which Deputy ASHU had access to and observed as part of his duties.

133.

Deputy ASHU failed to have either WALLACE or GOODMAN removed from the cell and or separated and or dressed.

134.

Deputy ASHU, despite knowing of the substantial risk to GOODMAN's safety caused by being housed naked in a cell with WALLACE, was deliberately indifferent to GOODMAN's safety.

135.

Deputy ASHU was aware of a substantial risk of serious harm to GOODMAN and did nothing to address the threat or to protect GOODMAN.

136.

It is clearly established that a prison official's deliberate indifference to a known, substantial risk of serious harm to an inmate violates the Fourteenth Amendment.[5]

137.

It is also clearly established that prison officials violate an inmate's constitutional rights when they take no measures to protect an inmate/victim from attack, beating, rape, and murder by another inmate when that other inmate has a violent history and has been in violent and threatening altercations with the inmate/victim and or knows that there is a substantial risk of rape and or violence.[6]

---

[5] See *Cottone v. Jenne*, 326 F.3d 1352, 1358 (11th Cir. 2003).

[6] See, e.g. *Bowen v. Warden, Baldwin State Prison*, 826 F.3d 1312, 1321 (11th Cir. 2016) (finding viable failure to protect claim after inmate asked to be removed from the cell he shared with a dangerous cellmate); *Caldwell v. Warden, FCI Talladega*, 748 F.3d 1090, 1101 (11th Cir. 2014) (finding viable failure to protect claim where Plaintiffs inmate was placed in a cell with another inmate who had a "violent past, was very disruptive, and needed greater management" who had "expressed no regret at having endangered [the Plaintiffs's] life or safety," and who may have been "targeting [the Plaintiffs] with his unsafe actions.")

## COUNT TWO
## DEFENDANT E. BURGESS'S
## DELIBERATE INDIFFERENCE TO GOODMAN'S SAFETY

### 138.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein as applicable to Defendant E. BURGESS.

### 139.

Defendant E. BURGESS was acting within the scope of his or her employment as a state actor under the color of law during all events described in this Complaint.

### 140.

Defendant E. BURGESS was responsible for maintaining the safety of the Jail's inmates, including preventing inmate-on-inmate assaults.

### 141.

Defendant E. BURGESS was responsible for the housing of inmates including the housing of GOODMAN.

### 142.

Defendant E. BURGESS knew that GOODMAN was experiencing a mental health crisis and had exhibited behaviors such as smearing bodily fluids and wastes on the walls of his cell MH-7.

143.

Defendant E. BURGESS had the responsibility to know the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates.

144.

A copy of the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates was accessible to Defendant E. BURGESS.

145.

Defendant E. BURGESS knew the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates required that mental health inmates, especially those who had assaultive behavior, were to be housed alone.

146.

Upon information and belief Defendant E. BURGESS chose to double-cell GOODMAN in order to punish and or "teach him a lesson" and or to moderate GOODMAN's uncontrolled psychiatrically abnormal behaviors.

147.

Double celling is impermissible if it would create a substantial risk of harm to an inmate by being housed with another inmate, who should be housed alone.

148.

Double celling is impermissible for mental health inmates who have a history or proclivity toward assaultive behavior.

149.

Defendant E. BURGESS chose to double-cell GOODMAN with WALLACE despite Defendant E. BURGESS's knowledge that WALLACE was a dangerous gang-affiliated MAX / maximum security inmate, prone to and convicted of violent crimes who had a history of disciplinary problems at Clayton County Jail.

150.

BURGESS knew that GOODMAN was a pretrial detainee, was not convicted, was not a gang member, and was experiencing a mental health crisis and had been arrested for assault. BURGESS also knew that GOODMAN asked to be housed alone.

151.

Defendant E. BURGESS's double-celling of GOODMAN with WALLACE was enforced despite the obvious and substantial risk that being housed with WALLACE presented to GOODMAN.

152.

Defendant E. BURGESS's double-celling of GOODMAN with WALLACE failed to take into account considerations for GOODMAN's safety.

153.

Defendant E. BURGESS's double-celling of GOODMAN with WALLACE violated the classification system and or placement policy, procedures, and guidelines for quartering of Clayton County Jail's inmates.

154.

Defendant E. BURGESS's double-celling of GOODMAN with WALLACE was deliberately indifferent to the substantial risk of harm to GOODMAN from being in the cell with WALLACE and resulted in harm to GOODMAN.

## COUNT THREE
## WRONGFUL DEATH

### 155.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

### 156.

Jaylan GOODMAN died unmarried and without children

### 157.

All Defendants were subjectively aware of a substantial risk of serious harm to Plaintiffs and did nothing to address the threat or to protect Plaintiffs.

### 158.

Plaintiffs are GOODMAN's parents and as such hold statutory rights under O.C.G.A. § 51-4-2 to pursue a wrongful death action regarding GOODMAN's death.

### 159.

Plaintiffs pursue a wrongful death claim here in that capacity

### 160.

In their capacity as GOODMAN's parents, Plaintiffs are entitled to recover the full value of GOODMAN's life and extreme pain and suffering as a result of

Defendants' acts and omissions while GOODMAN was an inmate in the custody of Defendants at Clayton County Jail.

**COUNT FOUR**
**STATE LAW NEGLIGENCE Against RN THORNTON,**
**RN FLOWERS, MARSHA DEJOURNETT,**
**ALTHEA LOGAN, and NP JACQUELINE PARRISH**

161.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

162.

Plaintiffs set forth herein an ALTERNATE legal theory against RN THORNTON, RN FLOWERS, MARSHA DEJOURNETT, ALTHEA LOGAN, and NP JACQUELINE PARRISH:  to the extent these Defendants  knew about the danger that existed and failed to document, failed to inform, failed to follow medical protocols regarding screening, evaluation, referrals, staff communications, and or failed to report to the other Defendants about GOODMAN's and or WALLACE's mental health circumstances (i.e., that they were "psychotic" and or "delusional" and or both), these Defendants had a duty to Plaintiffs to exercise ordinary care, and failed to exercise ordinary care, failed to exercise "control" to confine and or restrain, and thereby Defendants breached their duty of care to Plaintiffs.

As a direct and proximate result of Defendants' actions and inactions as described herein, GOODMAN suffered serious injury and damage for which Defendants are liable including, but not limited to: physical, mental, and emotional pain and suffering; humiliation; embarrassment; distress; and death. The above-described conduct in failing to comply with the professional standards of care applicable to medical and mental health providers in general under similar circumstances and conditions constitutes negligence under Georgia law.

**COUNT FIVE**
**DELIBERATE INDIFFERENCE Against**
**RN THORNTON, RN FLOWERS, MARSHA DEJOURNETT,**
**ALTHEA LOGAN, and NP JACQUELINE PARRISH**

164.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim herein.

165.

The above-described conduct of the individual mental health Defendants violated clearly established law of which a reasonable medical provider should have known, and said individual Defendants are not entitled to qualified immunity

and are liable under 42 U.S.C. §1983 for violating the Fourteenth Amendment

rights of Plaintiffs' decedent.[7]

## COUNT SIX
## STATE LAW RESPONDEAT SUPERIOR CLAIM Against CORRECTHEALTH, LLC, CORRECTHEALTH CLAYTON, LLC

### 166.

Plaintiffs incorporate and reallege all allegations as if set forth fully verbatim

herein.  At all times relevant herein, RN THORNTON, RN FLOWERS,

MARSHA DEJOURNETT, ALTHEA LOGAN, and NP JACQUELINE

PARRISH were employees or agents of Defendant CorrectHealth Clayton, LLC

and or CorrectHealth, LLC who were acting within the scope of said agency or

employment.

### 167.

Defendant CorrectHealth Clayton, LLC and or CorrectHealth, LLC are

liable under the doctrine of respondeat superior for the negligence of RN

THORNTON, RN FLOWERS, MARSHA DEJOURNETT, ALTHEA LOGAN,

and NP JACQUELINE PARRISH, as well as the negligence of any of its other

---

[7] No federal claim has been pled against either CorrectHealth. LLC or CORRECTHEALTH CLAYTON, LLC because there is no respondeat superior liability under Section 1983, so they have been sued under state law only (Count Six).

employees or agents who have not been named as Defendants, in causing the death of Plaintiffs' decedent.

168.

In addition to being vicariously liable for the negligence of RN THORNTON, RN FLOWERS, MARSHA DEJOURNETT, ALTHEA LOGAN, and NP JACQUELINE PARRISH and other unnamed employees or agents, CorrectHealth Clayton, LLC and or CorrectHealth, LLC is directly liable for its own negligence in hiring, training, retention, and implementation of proper policies, procedures and protocols to the extent that such deficiencies become known though discovery and are proven at trial by expert testimony.

## DAMAGES

As a direct and proximate result of the aforementioned unconstitutional, and unlawful misconduct of the Defendants, Plaintiffs' decedent died a premature death and experienced significant conscious pain and suffering in the horrific moments leading up to his death, and his estate incurred funeral and other necessary expenses, for which Plaintiffs are entitled to recover the full value of the life of the decedent as well as compensatory damages for the aforesaid losses and injuries in an amount to be proven at trial and determined by a fair and impartial jury.

169.

The aforementioned conduct of one or more Defendants rose to such a level of bad faith, willfulness, and reckless disregard for the consequences as to authorize the imposition of punitive damages against such Defendants.

170.

Plaintiffs are entitled to recover reasonable attorney's fees pursuant to 42 U.S.C. §1988.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for damages and request the Court:

a. Issue process and summons in accordance with the law;

b. Award Plaintiffs compensatory and general damages in an amount of not less than the full value of GOODMAN's life as to be determined by the jury against all Defendants, jointly and severally;

c. Award Plaintiffs punitive damages in an amount as to be determined by the enlightened conscience of the jury against all Defendants, jointly and severally;

d. Award costs of this action, including attorneys' fees, to Plaintiffs, pursuant to 42 U.S.C. § 1988 and other applicable laws regarding such awards against Defendants, jointly and severally;

e. Award pre- and post- judgment interest to Plaintiffs under federal statutes and case law;

f. Award Plaintiffs such other and further relief as it deems equitable, just and

necessary; and

g. Grant Plaintiffs a trial by jury.


This 8th day of January, 2024.

**ERIC J. HERTZ, PC**

*/s/ Jeffrey E. Gewirtz*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210, Atlanta, GA 30350
(404) 577-8111; Fax: (404) 577-8116
*Counsel for Plaintiff*


The undersigned, in accordance with L.R. 7.1 and 5.1, hereby certifies that the type-font used herein is 14-point Times New Roman font.

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| VALENCIA GOODMAN and | ) | |
| GREGORY MALOY, individually | ) | |
| and as administrators of the ESTATE | ) | |
| OF JAYLAN ANDRISE | ) | |
| GOODMAN, | ) | |
| | ) | |
| Plaintiffs, | ) | CIVIL ACTION CASE NO.: |
| | ) | **1:23-CV-03057-JPB** |
| v. | ) | |
| | ) | |
| DEPUTY PHILIP ASHU | ) | |
| OFFICER E. BURGESS | ) | |
| CORRECTHEALTH CLAYTON, LLC | ) | |
| CORRECTHEALTH, LLC | ) | |
| RN THORNTON; RN FLOWERS; | ) | |
| MARSHA DEJOURNETT | ) | |
| ALTHEA LOGAN | ) | |
| NP JACQUELINE PARRISH | ) | |
| JOHN DOES 1-10 | ) | |
| Defendants. | | |

## CERTIFICATE OF SERVICE

I hereby certify that I am counsel of record for Plaintiffs and that on the day
indicated below I served a true and correct copy of PLAINTIFFS' AMENDED
COMPLAINT on all counsel of record.

This 8th day of January, 2024.

**ERIC J. HERTZ, PC**

*/s/ Jeffrey E. Gewirtz*
Jeffrey E. Gewirtz
GA State Bar No. 292434
*jeff@hertz-law.com*
8300 Dunwoody Pl. Suite 210, Atlanta, GA 30350
(404) 577-8111; Fax: (404) 577-8116
*Counsel for Plaintiff*